JUDGE SWEET

13 CV 1275

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BAILEY STOLER, AMY HESS, and JESSICA
MARCUS, individually and on behalf of all others
similarly situated,

                    Plaintiffs,

          - against -

INSTITUTE FOR INTEGRATIVE NUTRITION and
JOSHUA ROSENTHAL,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FEB 25 2013

U.S.D.C. S.D. N.Y.
CASHIERS

ECF Case

CLASS ACTION
COMPLAINT

PLAINTIFFS DEMAND
A TRIAL BY JURY

        Individual and representative plaintiffs Bailey Stoler ("Stoler"), Amy Hess ("Hess"), and Jessica Marcus ("Marcus") (collectively, "plaintiffs"), on behalf of themselves and all others similarly situated, through their attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complain of defendants the Institute for Integrative Nutrition ("IIN" or the "Company") and Joshua Rosenthal ("Rosenthal") (collectively, "defendants"), as follows:

### NATURE OF ACTION

    1.    Plaintiffs bring this action on their own behalf and on behalf of similarly situated individuals to remedy defendants' discrimination and retaliation against IIN's female employees on the basis of sex, pregnancy and marital status in violation of the Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

    2.    Plaintiffs also bring this action against defendants on their own behalf and on behalf of others similarly situated to remedy violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

3.     Defendants engage in a pattern or practice of discriminating against the Company's female employees on the basis of sex, pregnancy and marital status.  When a female employee gets married, pregnant or has children, defendants begin a campaign of newly-minted criticism and demotions, often resulting in the employee's dismissal.   Further, defendants discriminate and retaliate against these employees from the moment they announce their pregnancy and their intention to exercise their rights under the FMLA.

<u>JURISDICTION AND VENUE</u>

4.     The Court has jurisdiction over plaintiffs' FMLA claims under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

5.     The Court has jurisdiction over plaintiffs' City Law claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  This is a putative class action in which (a) the aggregate sum or value of the claims of the proposed class members exceeds $5,000,000; (b) there are at least 100 or more members in the proposed class; and (c) at least one of the proposed class members has a different citizenship from at least one defendant.

6.     In addition, the Court has supplemental jurisdiction over plaintiffs' City Law claims pursuant to 28 U.S.C. § 1367 because they are so related to plaintiffs' federal claims that they form part of the same case or controversy.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants reside within the Southern District of New York, and because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

8.     Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiffs served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

2

## PARTIES

### Plaintiffs

9.     Plaintiff Stoler is a 31-year-old mother who has worked for IIN for almost three years.  Prior to taking maternity leave, Stoler was a member of the Company's Executive Management Team and held Director level positions in three departments, reporting directly to Rosenthal, IIN's founder and Director.

10.     Plaintiff Hess is a 33-year-old mother who worked for IIN for more than one year.  Hess was IIN's Marketing Manager before she announced her pregnancy.  Defendants terminated Hess's employment less than two weeks before she gave birth.

11.     Plaintiff Marcus is a 29-year-old pregnant woman.  She has worked for IIN for almost two years.  Before getting married and announcing her pregnancy, she was regarded as one of IIN's top managers.

12.     Stoler and Marcus are current employees of defendants.  Hess is a former employee.

### Defendants

13.     Defendant IIN is a health coaching and nutritional education school with its principal place of business in New York City.  IIN touts itself as the world's largest nutrition school, with more than 30,000 current and former students worldwide.  IIN is an employer within the meaning of the FMLA and the City Law.

14.     Defendant Rosenthal is IIN's founder and Director.  Upon information and belief, he is either the sole or majority owner of IIN.  Rosenthal was responsible for most, if not all, of the employment decisions complained of herein.  Rosenthal is an employer within the meaning of the FMLA and the City Law.

3

## FACTUAL ALLEGATIONS

### Background

15.     Defendants hire many female employees.  However, when a female IIN employee gets married, becomes pregnant or requests maternity leave, her advancement within the Company stops.  Thereafter, her role is often diminished, her compensation cut and, ultimately, she is fired.

16.     The Company's unlawful practices stem from the discriminatory beliefs of its founder and Director, Rosenthal.  He believes that women with family responsibilities are less valuable and less committed to their work than other employees.

17.     Rosenthal has stated his belief that "women's priorities shift when they have a baby" and that "things change when you have something growing inside of you."  He has advised his female employees who get pregnant that they should think about whether they want to continue to work and maintain a career because, in his view, "I have never met a new mom who didn't underestimate the sleep, time, and exhaustion from a new baby."

18.     Under Rosenthal's direction, the Company considered female employees' maternity status in reviewing their performance.  In particular, in early 2012, defendants created a form for managers to use to evaluate members of their team.  Among other things, the form requested that each manager determine each employee's "future plans," including whether the employee had any "maternity" plans.

### Defendants' History of Discriminating Against Women on the Basis of Marital Status, Pregnancy, Family Obligation and Maternity Leave

19.     Defendants have a history of demoting and firing the Company's female employees who have family obligations or those who take maternity leave.  Upon information and

4

belief, within the past two years alone, defendants have fired numerous women under such circumstances:

      a.  In or about late 2010, IIN's Education Curriculum Coordinator requested an FMLA maternity leave. Defendants eliminated her position while she was on leave;

      b.  In or about January 2011, IIN's Education Department Manager took a maternity leave. Defendants claimed that her position had been eliminated while she was on leave. In fact, they replaced her with an unmarried female;

      c.  In or about March 2012, defendants fired a female member of the Web and Apps Team days after she announced her pregnancy;

      d.  In or around April 2012, defendants fired a female member of the Company's Executive Management Team after she announced that she was engaged to be married;

      e.  In or around October 2012, defendants fired another female member of the Executive Management Team shortly after she announced that she was engaged to be married. Prior to terminating her employment, Rosenthal stated his belief that the employee's "focus" had changed because of her engagement and upcoming wedding; and

      f.  In or about early November 2012, defendants fired a female Sales Team Manager shortly after her marriage.

      20.    Moreover, female employees who complained about the Company's discriminatory practices suffered retaliation, including, among other things, demotions and reduced compensation.

<u>Defendants Create a "Maternity Projection" Chart</u>

21.     Defendants view female employees who get pregnant as problems.  For example, Rosenthal has stated that it is "bad karma to get stuck with pregnant women who underperform."  In one instance, shortly after learning that one of his female employees was pregnant, Rosenthal stated, "We should have fired her before she got pregnant" and demanded that the female employee be fired immediately.

22.     In or about February 2012, Rosenthal held a meeting with IIN's Human Resources ("HR") Department where he addressed the maternity issue.  During this meeting, Rosenthal expressed his concerns about IIN's "staffing liability."  Rosenthal said that IIN was going to have a "problem" because most of the staff was going to get pregnant.

23.     Rosenthal instructed HR to collect information about all of the Company's female employees and create a chart projecting the likelihood that each female employee will become pregnant.

24.     Entitled "Maternity Projection," the chart tracked information about the age, marital or relationship status, and family status of each of the Company's female employees (more than 120).

25.     Based on this information, the chart predicted how soon, in defendants' views, each female employee was likely to have a child (or a second child).  For example, defendants' chart listed plaintiff Stoler as "Relationship/Married + 1 child" and plaintiff Marcus as "Engaged + b/w 25-34 years old."  In defendants' views, therefore, Stoler and Marcus were "likely" and "fairly likely" to "have a child" within the next "2-3 years."  Plaintiff Hess was described as "Married + b/w 25-34 years old" and thus "likely to have a child w/in 1-2 years."

492541 v9

26.    Upon information and belief, defendants updated the chart as they gathered more information about the Company's female employees.

27.    None of IIN's male employees, including those who were married or had children, were included in this chart.

28.    Upon information and belief, IIN made employment decisions using the Maternity Projection chart.

29.    For example, prior to the beginning of Stoler's maternity leave in May 2012, IIN's Executive Management Team included Stoler and two men and two women.  As described in more detail below, defendants demoted Stoler upon her return from maternity leave and fired the two women shortly after they announced their respective engagements.  The Executive Team currently consists of the Company's male in-house counsel, three unmarried women between ages 22 and 25, and a married female who announced that she would be leaving the Company in Spring 2013.  Indeed, one of the women defendants promoted to the Executive Management Team is listed on defendants' Maternity Projection chart as "not likely" to have a child within the next five years.

### Plaintiff Bailey Stoler

30.    Plaintiff Stoler has more than ten years of professional experience.  She received her undergraduate degree from Tufts University in 2002, and in 2009, she received a Master of Business Administration degree from The Johnson School at Cornell University.  At Cornell, Stoler was one of 25 students selected as a Park Leadership Fellow.  Students are selected for this program based on their "demonstrated outstanding leadership potential."  Through the Fellowship, Stoler received full tuition and participated in a two-year leadership development program.  Prior to working for IIN, Stoler held leadership positions in several organizations, and was the founder and owner of a full-service marketing collateral company.

7

31.     Stoler began working for IIN on or about February 24, 2010.  Initially, defendants hired Stoler to perform an "organizational overview."  Stoler acted as an internal consultant and worked directly with the Company's then-Chief Executive Officer ("CEO").

32.     In or about April 2010, Stoler became IIN's Marketing Director.  In this position, Stoler was responsible for IIN's integrated marketing campaigns, which included oversight and strategy for many of IIN's programs.  In that role, Stoler managed a team of 10 to 18 employees.  In addition, defendants called upon Stoler to provide management and oversight to the Sales Team, and to spend approximately 25 percent of her time working with the CEO on larger projects within organizational management.

33.     In June 2011, IIN promoted Stoler to the Executive Team.  In this position, Stoler reported directly to Rosenthal and the CEO.  She was responsible for overseeing the entire organization, identifying organizational weaknesses and planning and implementing procedures to create more streamlined and efficient systems across the Company's eight departments.

34.     In September 2011, Rosenthal named Stoler as the Director of the Education and Student Services Departments.  As the Director of these departments, Stoler oversaw curriculum creation for IIN and overhauled the Student Services Department's processes to target inefficiencies and increase student satisfaction.  In that role, Stoler managed a staff of 32 employees.

35.     In November 2011, Stoler told Rosenthal that she was two-and-a-half months pregnant and intended to take maternity leave beginning in May 2012.  Rosenthal reacted by telling Stoler that, in his experience, "Women's priorities shift when they become mothers" and that she should consider this while planning her maternity leave and her return to work.

36.     Two weeks later, Rosenthal told Stoler that her position might not be the same when she returned from maternity leave, but that she was an excellent performer and there was no reason to be concerned that she would be let go.

37.     In February 2012, Stoler submitted paperwork related to her requested FMLA leave.

38.     Stoler began her FMLA leave on May 7, 2012.

39.     On or about August 2, 2012, Stoler sent Rosenthal an email asking what her position would be upon her return from maternity leave.  In response, Rosenthal asked Stoler to call him.  During this conversation, Rosenthal said that he was not sure what Stoler's position would be and that he might need her to lead the Sales Team or be his liaison to the Marketing Department.

40.     Initially, Stoler's leave was scheduled to last until September 10, 2012; however, due to an issue with childcare, Stoler asked Rosenthal for a two-week extension of her leave.  Rosenthal granted this extension and Stoler's new return date was set for September 24, 2012.

41.     On September 6, 2012, however, prior to the end of Stoler's FMLA leave, Rosenthal asked Stoler to come to the office on Wednesday afternoons to attend the weekly Managers' Meeting so that she could gain exposure to what was happening in the organization. Stoler agreed to attend these meetings.

42.     On September 23, 2012, Rosenthal claimed in an email that "things got a bit wonky when [IIN] extended [Stoler's] return date" and that there were too many managers. Rosenthal told Stoler that she should not report to work the next day so that he could figure out a role for her.

9

43.     Rosenthal removed Stoler from her senior management position and arranged for her to return as an employee in the Marketing Department.  According to the Company's organizational chart, Stoler would return to a position two levels below her previous position.  She would no longer manage any employees.

44.     Stoler sent an email to Rosenthal and asked for more information about her new role.  Stoler told Rosenthal, "It does hurt to have been a manager for two-and-a-half years and now just to be a member of the marketing team."  Rosenthal claimed to understand Stoler's concern, but stated that she would be responsible for two large projects.  As Rosenthal said, Stoler would have the opportunity to "prove" herself, and then possibly take on assignments that are more substantial.  Prior to Stoler's maternity leave, she had never been told that she would need to "prove" herself in order to take on senior responsibilities.

45.     Stoler resumed work full time on September 25, 2012.  After working out of her own private office for two years, most recently in the Company's executive wing, defendants placed Stoler in a cubicle.  When Stoler arrived at her desk, she found that someone had collected her personal belongings from her former office and then dumped them carelessly on her new desk.  As there was no place for Stoler to pump breast milk - an accommodation that she had asked for previously - Stoler was forced to pump in the bathroom.

46.     Rosenthal dismissed Stoler's concerns about being demoted.  In his view, Stoler was "just in culture [shock] from being at home with baby."

47.     When Stoler returned to work full time, she sent an instant message to an IIN HR Manager stating that "coming back to a demotion of this size [was] very disheartening."  The HR Manager replied that she did not believe that Stoler had been demoted, noting the two projects assigned to Stoler.  Stoler informed the HR manager that defendants had listed Stoler as only a

10

Project Manager on the organizational chart and had placed her in a cubicle with the other Project Managers.

48.     Shortly after Stoler's conversation with the HR Manager, Rosenthal called Stoler. Stoler told Rosenthal that she was upset about her demotion and the treatment of her upon her return from maternity leave. Rosenthal again dismissed her concerns. He told her that she was "making this up" and that she had been in "a very soft world with [her] baby for the past few months, so the work world [felt] very harsh and aggressive to [her]." He then reiterated that she had two important projects and now needed to "prove [herself] and move up in the organization." Rosenthal told Stoler that he would allocate staff and resources to help Stoler with these projects.

49.     On September 26, 2012, Stoler met with Michael Posavetz ("Posavetz"), the Company's former COO and in-house counsel, and an HR Manager to discuss her demotion and the treatment she received upon her return from maternity leave. Stoler told them that she was very upset that defendants demoted her while she was on maternity leave and that she believed it was unfair. She said that her assignment to a cubicle and the reduction in her responsibilities made her feel uncomfortable. Like Rosenthal, Posavetz and the HR Manager ignored Stoler's complaints. They instead contended that she was responsible for two projects and that she "should be happy for that." They nevertheless agreed to move Stoler into an office so that she could pump breast milk in private.

50.     During October and November 2012, Stoler repeatedly requested staff and resources for her projects. Rosenthal, however, denied her requests. In addition, Rosenthal refused to communicate important pieces of information to Stoler regarding her projects.

51.     In November 2012, Rosenthal cut the budget of one of Stoler's major projects and assigned her to report to two junior employees. Upon information and belief, one of

11

the employees assigned to supervise Stoler on a project is 24 years old, unmarried, and does not have children; she is listed on defendants' Maternity Projection chart as "not likely" to have children within the next five years.  The other employee assigned to supervise Stoler is 25 years old and married, but does not have children.  She has stated her intention to resign from IIN in May 2013.  Rosenthal gave another of Stoler's primary projects to two other junior employees.  Neither of the employees assigned that project have children.  Moreover, one of them is listed on defendants' Maternity Projection chart as "not likely" to have children within the next five years.

52.    On November 6, 2012, Stoler met with Rosenthal and one of the junior employees who was assigned to oversee Stoler on one of her projects.  Stoler respectfully stated that she did not want to be managed by the junior employee, and that she was upset that she had been left out of crucial conversations regarding her projects.  Stoler told Rosenthal that it seemed that he believed that she was less competent due to having a baby, but that it was not true.  She told him that she was just as dedicated and capable and that she would like her workload to reflect this.  Rosenthal claimed that he valued Stoler and then reiterated that she had two very important projects.

53.    On November 14 and 15, 2012, Stoler met with HR to discuss her compensation and the November 6 conversation with Rosenthal.  Stoler explained her complaints with the way Rosenthal and IIN were treating her.  Posavetz then told her that it was possible that her sales bonus of up to $48,000 annually, which was paid monthly and had been paid to Stoler since June 2011, would be cut as of January 2013.  In addition, Posavetz told Stoler that she would no longer be eligible for her other bonus of up to $50,000.  IIN had promised Stoler this $50,000 bonus as part of her yearly compensation increase in February 2012, to be paid in February 2013.  Stoler told Posavetz that she was very uncomfortable with facing such a large pay cut going forward.

492541 v9

54.    On November 29, 2012, Stoler met with HR again to discuss the bonus of up to $50,000.  Posavetz told her that she was still eligible for the bonus for that year, but that her eligibility for that bonus would not be renewed.  Upon information and belief, Stoler's compensation for 2013 will be reduced by as much as $98,000 due to these changes.

55.    On December 18, 2012, Rosenthal approached Stoler and told her that "ever since [she] gave birth, [he's] wanted to give [Stoler] space and keep [her] away from everything and the fast work in the Company."  He then invited her to attend a marketing meeting so that she could "become more involved in the Company."

56.    In or about January 2013, defendants posted a job listing for a high-level executive, which described Stoler's role and responsibilities prior to her maternity leave.

<u>Plaintiff Amy Hess</u>

57.    Plaintiff Hess has more than 10 years of experience in marketing and public relations.  Hess received her Bachelor of Arts degree in 2001 from the University at Albany, State University of New York.  In 2005, Hess began working for Confirmit, a market research solutions provider, as a Marketing Manager.  At Confirmit, Hess managed a team of employees and was responsible for Confirmit's integrated marketing campaigns and lead generation programs, which involved content and promotion strategy for email marketing, social media, Pay-Per-Click, and public relations.

58.    Hess began working at IIN on or about November 16, 2011, as the Marketing Manager, reporting to the CEO.  In this role, she was responsible for IIN's integrated marketing campaigns, as Stoler had been previously.  Internally recognized as the Marketing Director, Hess managed a staff of 15 to 18 employees.

13

59.     On October 9, 2012, Hess sent Rosenthal an email telling him that she was pregnant and would need to take FMLA leave from February 2013 to May 2013.  That same day, she also told the CEO and HR about her pregnancy and intended leave.

60.     On or about October 24, 2012, Rosenthal met with Hess with a co-worker present.  Rosenthal told Hess that he had "never met a new mom that didn't underestimate the sleep, time, exhaustion from a new baby."  Rosenthal advised Hess to speak with her partner to see "if it was worth it."  Rosenthal instructed Hess to let him know her decision by the following Monday. He told her that she was at a certain level of performance, but with the CEO leaving the Company and Hess having a baby, Rosenthal needed to "protect" himself and the Company because her performance could decline.

61.     Hess sent Rosenthal an email on Tuesday, October 30, 2012, the day after Hurricane Sandy hit the Northeast, and informed him of her decision to remain with IIN.  She told him that her work performance and capacity were not diminished by her pregnancy, and that she did not anticipate that happening after she had her child.  Hess said that she fully expected to return to her position after her maternity leave and to continue to report to Rosenthal and the new CEO.

62.     Upon information and belief, defendants looked for a reason to terminate Hess's employment.

63.     For example, Hess received several emails from Rosenthal falsely criticizing her performance and questioning her approach to her duties.

64.     Hess was out of the office on vacation from November 19 through November 21, 2012.  During this time, Rosenthal held several meetings with the members of Hess's team and others.  Rosenthal told them that he, not Hess or the CEO, runs Marketing and that Hess "is not in charge."  In addition, Rosenthal told the team that Hess was "spread too thin" and could

not manage all that she had managed before.  In fact, Hess was just as capable of doing her job as she had been before announcing her pregnancy.

65.     On November 26, 2012, Hess had a meeting with Rosenthal, Posavetz and another employee.  Rosenthal told Hess that he thought she was "spread too thin" and that he sensed that she might not be able to run certain areas anymore, which required him to become more involved.  Hess asked Rosenthal whether she was being demoted or having her salary decreased.  Rosenthal said no, but that Hess would eventually hear about the changes to her role with the Company and what areas she would no longer oversee.  During this meeting, Hess also learned that Rosenthal had asked two junior employees who were not pregnant and did not have children to take over some of Hess's management responsibilities.  Upon information and belief, neither of these employees was as qualified as Hess.

66.     On November 29, 2012, Rosenthal invited Hess to a meeting in her office to discuss future marketing plans with two members of Hess's team and an outside consultant.  During that meeting, Rosenthal expressed concern for Hess's workload and threatened that people who were "spread too thin" would have their compensation decreased.

67.     On November 30, 2012, Hess followed up with Rosenthal.  In an email to Rosenthal and others, Hess stated that while she was capable of doing her job and did not need to have responsibilities taken away from her, she understood that was what management believed.  She requested more clarity about her new role and asked how these changes would affect her team.  Hess did not receive a response to this email and followed up on December 12, 2012.

68.     On December 13, 2012, Hess met with Rosenthal, Posavetz, and another employee.  Rosenthal began the meeting by purporting to praise Hess and her team and claimed that she was not being demoted or fired; however, Rosenthal told Hess that she would no longer be

15

supervising one of her teams.  Rosenthal told Hess that she should be happy with the change because millions of dollars had been misspent.  Rosenthal acknowledged that many of these purported issues were caused by the CEO, but said that Rosenthal would need to take over for the time being.

69.     The next day, December 14, 2012, Hess met with Posavetz and HR. Posavetz noted that Rosenthal did not know how things would "work out" in her department, and therefore, Hess would not receive a raise and her bonus would be cut for 2013.  Hess's 2012 bonus was approximately $25,000, a significant portion of her total compensation.  Posavetz then told Hess that she would receive "a small increase or a put-your-mind-at-ease amount" of $5,000, based on the changes being made to her department and her concerns about job security.  Posavetz reiterated that Rosenthal was not sure what Hess's role with IIN would be in the future or what value she had provided, or would provide, but said those issues would be determined in January 2013.

70.     During December 2012, Rosenthal met with several employees and told them that Hess's "role change" would not be settled until mid-January 2013.

71.     Rosenthal told at least one of Hess's colleagues to avoid working with Hess.

72.     In or about December 2012, defendants posted a job listing for a new Marketing Director, which described Hess's current role and responsibilities.  In effect, defendants were seeking to replace Hess.

73.     In or about early 2013, defendants stated to Hess that the Company would have to reduce headcount because of financial difficulties.  At the same time, however, Rosenthal boasted about the Company's 30% per year growth despite a troubled economy.

74.     On February 8, 2013 – ten days before the start of Hess's maternity leave – defendants terminated her employment.  Defendants' stated reason for firing Hess was that she had

16

made misrepresentations to the Company; in fact, this was not the actual or complete reason. Defendants fired Hess because of discrimination and retaliation.

75.     Hess had a baby less than two weeks later.

<u>Plaintiff Jessica Marcus</u>

76.     Plaintiff Marcus is an experienced Registered Dietitian and New York State Certified Dietitian-Nutritionist. In 2005, Marcus received a Bachelor of Science in Biology degree from the University of Michigan and, in 2010, she received a Master of Science in Dietetics degree from Eastern Michigan University. Marcus was a Research Fellow at the National Institute of Allergy and Infection Disease, part of the National Institutes of Health. Prior to her employment with defendants, Marcus worked as a Nutritionist and Clinical Dietician for several nutrition and health organizations, including The Center for Mind-Body Medicine and Alexandria Neighborhood Health Services, Inc. She is an active member of the American Dietetic Association ("ADA") and the Dietitians in Integrative and Functional Medicine practice group within the ADA.

77.     IIN hired Marcus on April 11, 2011, as a Curriculum Developer. Her starting salary was $45,000 per year.

78.     During the summer of 2011, Marcus was given increasing responsibilities and she began to hire and manage staff for the nutrition team.

79.     In September 2011, Marcus announced that she was engaged to be married.

80.     On or about December 8, 2011, Stoler strongly recommended to Rosenthal that he make Marcus the Education Department's Manager/Director. Rosenthal declined, saying that Marcus was "getting married, and her head was in another place." Rosenthal eventually

492541 v9

promoted a more junior employee; that employee is listed on defendants' Maternity Projection chart as "not likely" to have a child within the next five years.

81.    On or about March 29, 2012, Rosenthal told Marcus that if she made certain cuts to her department by November 2012, she would receive a raise to $100,000 per year.

82.    Over the course of the next month, Marcus reduced the size of her team pursuant to Rosenthal's request.

83.    In June 2012, while Stoler was on leave, Rosenthal asked Marcus to be the Manager of Student Services.  In this role, Marcus managed 20 staff members and reported directly to Rosenthal.  Rosenthal praised Marcus for being a strong leader and having a strong team. Initially, Marcus was hesitant to take on this new role because, as a registered dietician, she had focused primarily in nutrition; however, Rosenthal agreed to let Marcus continue to run her nutrition team while running Student Services.  When Marcus asked whether Stoler would resume her position as Manager/Director of Student Services when Stoler returned from leave, Rosenthal told her that Marcus would continue to oversee Student Services.

84.    On June 27, 2012, at an off-site meeting, Rosenthal praised Marcus as being one of IIN's strong, unique leaders and for having unique qualities.  He then asked Marcus and others for their advice regarding the future of IIN; he asked them for their help in developing a plan.

85.    In August 2012, Marcus was one of the top two managers in the Education Department as well as the sole manager of the Student Services Department.

86.    On August 13, 2012, Marcus sent Rosenthal an email informing him that she was pregnant.  In this email, Marcus assured Rosenthal that she was committed to her work and that nothing would change.

18

87.     On August 14, 2012, Rosenthal met with Marcus regarding her pregnancy. During this meeting, Rosenthal told Marcus that there had been conversations about whether to retain her. He told her that he was not sure that they were on the "same page" and said that "maybe it will work; maybe it will not."

88.     The next day, on August 15, 2012, Marcus met with Posavetz, who was responsible for overseeing HR. Marcus told Posavetz that she was nervous that she would lose her job because she was pregnant. Marcus also told him that the Company had a history of laying off pregnant women. Posavetz said that it was not the Company's policy to fire pregnant women, but Marcus told him that the timing of such events seemed suspicious.

89.     On August 16, 2012, Posavetz told Marcus that he had brought her concerns to Rosenthal and that Rosenthal had told him to document everything, but would not say anything else.

90.     On September 5, 2012, Marcus had a meeting with Rosenthal to continue what she believed was a prior discussion about IIN's future goals. However, Rosenthal invited an HR representative to the meeting. Instead of discussing the future of the Company, Rosenthal and the HR representative wanted to discuss a purported issue with Marcus's listening skills.

91.     On September 13, 2012, Rosenthal told Marcus that the Company was placing her in a different role. Marcus would now work on two special projects and spend one-third of her time in a peripheral role on the Education Team, supporting the new Manager/Director. She was no longer part of the management team.

92.     On September 21, 2012, IIN officially removed Marcus from her position as Nutrition Manager. In her place, IIN promoted an unmarried woman with no children, whom Marcus had hired and trained.

93.     On or about December 6, 2012, Marcus met with Posavetz and HR to discuss her compensation.  Posavetz told Marcus that Rosenthal no longer wanted her to work on one of her previously assigned projects, thereby removing a third of her responsibilities.  He added that Rosenthal wanted to move Marcus to the Education Department full time.  Marcus received a salary increase to $75,000, effective in January 2013, $25,000 less than what Rosenthal had promised.

94.     In her new position in the Education Department, Marcus reported to a junior employee and managed no one.

## CLASS ACTION ALLEGATIONS

95.     As set forth herein, defendants engaged in a pattern or practice of discriminating against female employees in the terms and conditions of employment, based on their status as married women, pregnant women, mothers or because they have, or will, take maternity leave, or because they complained about such discrimination.

96.     These claims are brought as a class action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure by plaintiffs on behalf of themselves and all current or former female employees working at IIN during the past three years (the "Class Members").

97.     The number of potential Class Members is not precisely determined at the present time but can be established through discovery.  On information and belief, the class consists of approximately 200 to 300 current and former employees and, therefore, is so numerous that joinder is impracticable.

98.     All Class Members have been damaged by the same wrongful acts alleged herein.  These acts raise questions of law or fact common to the class that predominate over any

questions affecting only individual members of the class. These questions include, but are not limited to:

   a. whether defendants have engaged in a pattern or practice of sex discrimination by taking adverse action against female employees based on their current or future marital status;

   b. whether defendants have engaged in a pattern or practice of pregnancy discrimination by taking adverse action against female employees based on their current or future pregnancy status;

   c. whether defendants have engaged in a pattern or practice of sex discrimination by taking adverse action against working mothers;

   d. whether defendants have engaged in a pattern and practice of retaliating against female employees who complained about sex or pregnancy discrimination;

   e. whether defendants have engaged in a pattern and practice of discriminating against female employees who take or will take maternity leave; and

   f. whether defendants have engaged in a pattern and practice of retaliating against female employees who complained about discriminatory treatment in connection with maternity leave.

   99.   Named plaintiffs' claims are typical of the claims of the Class Members in that the claims of each class member arise from the same course of events, namely, defendants' pattern or practice of taking adverse action against female employees who are or will become pregnant, have family obligations, take or will take maternity leave or have complained about defendants' discriminatory practices.

21

100.   Plaintiffs will fairly and adequately represent the interests of the Class Members as they possess the same interests as members of the class. Plaintiffs' claims do not conflict with the interests of any other members of the class as they suffered from the same unlawful acts of defendants.

101.   Plaintiffs' attorneys are qualified to pursue this litigation and have experience in class action litigation.

102.   Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because defendants have acted on grounds generally applicable to the Named Plaintiffs and potential Class Members by adopting and following systemic policies, practices and procedures that are discriminatory and retaliatory.

103.   Moreover, defendants' systemic discrimination and retaliation, and refusal to act on grounds that are not discriminatory or retaliatory, have made injunctive relief and declaratory relief appropriate with respect to the class as a whole.

104.   Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class. These patterns or practices have been effectuated by IIN's founder and Director, Rosenthal, and constitute a widespread policy of discrimination and retaliation against IIN's female employees in violation of the City Law and the FMLA. Named plaintiffs and each Class Member have suffered harm as a result of such violations.

105.   Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The resolution of the common claims of named plaintiffs

492541 v9

and Class Members in a class proceeding will achieve significant economies of time, effort, and expense.

106.    The class has been damaged in the form of lost wages and benefits, loss of earning potential, emotional distress, humiliation, and pain and suffering, and is entitled to recovery as a result of defendants' unlawful practices.

107.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, especially in the context of a litigation involving individual plaintiffs who may lack the financial resources to prosecute such a lawsuit vigorously.

108.    On information and belief, no litigation similar to this action is currently pending. A class action regarding the issues in this case creates no problems of manageability.

## FIRST CAUSE OF ACTION

### (FMLA Violations)

109.    Plaintiffs repeat and reallege paragraphs 1-108 above.

110.    By the acts and practices described above, defendants interfered with, restrained and retaliated against plaintiffs and Class Members for attempting to exercise their rights under the FMLA, in violation of the FMLA, 29 U.S.C. §§ 2612(a), 2614(a)(1) and 2615(a)(1).

111.    Defendants knew that their actions violated the FMLA; defendants' violations of the FMLA were not in good faith.

112.    As a result of defendants' actions violating the FMLA, plaintiffs and Class Members have suffered and will continue to suffer irreparable injury and other monetary damages unless and until this Court grants relief.

23

## SECOND CAUSE OF ACTION

### (Discrimination Under City Law)

113.    Plaintiffs repeat and reallege paragraphs 1-112 above.

114.    By the acts and practices described above, defendants discriminated against plaintiffs and Class Members in the terms and conditions of their employment based on their marital status, or their status as a pregnant woman or a woman with children, in violation of the City Law.

115.    As a result of defendants' discriminatory acts, plaintiffs and Class Members have suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damages.

## THIRD CAUSE OF ACTION

### (Retaliation Under City Law)

116.    Plaintiffs repeat and reallege paragraphs 1-115 above.

117.    By the acts and practices described above, defendants retaliated against plaintiffs and Class Members for their opposition to unlawful employment practices under the City Law.

118.    As a result of defendants' retaliatory acts, plaintiffs and Class Members have suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter a Judgment:

(a)    Certifying this matter as a class action and appointing the named plaintiffs as class representatives;

24

492541 v9

(b)     Declaring that defendants' conduct complained of herein violates plaintiffs' and Class Members' rights under the City Law and the FMLA;

(c)     Enjoining and permanently restraining defendants from violating the City Law and the FMLA;

(c)     Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiffs' and Class Members' employment opportunities;

(e)     Directing defendants to place plaintiffs and Class Members in the position they would have occupied but for defendants' discriminatory and otherwise unlawful conduct and making them whole for all earnings and other benefits they would have received but for defendants' unlawful treatment, including, but not limited to, wages and other lost benefits;

(f)     Directing defendants to pay plaintiffs and Class Members compensatory damages for their mental anguish and humiliation;

(g)     Directing defendants to pay plaintiffs and Class Members punitive damages;

(h)     Directing defendants to pay plaintiffs and Class Members liquidated damages;

(i)     Directing defendants to pay reasonable attorneys' fees and costs;

(j)     Directing defendants to compensate plaintiffs and Class Members for any adverse tax consequences;

(k)     Directing defendants to pay prejudgment interest; and

(l)     Granting such other and further relief as this Court deems necessary and proper.

492541 v9

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       February 25, 2013

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: _____
    Valdi Licul
    Attorneys for Plaintiffs
    1501 Broadway, Suite 800
    New York, New York 10036
    (212) 403-7300

26