UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

BAILEY STOLER, AMY HESS, and
JESSICA MARCUS, individually and on          13 Civ. 1275
behalf of all others similarly
situated,                                    OPINION

                    Plaintiffs,

     -against-

INSTITUTE FOR INTEGRATIVE NUTRITION
and JOSHUA ROSENTHAL,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiffs

          VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.
          150 Broadway, Suite 800
          New York, NY 10036
          By:  Valdi Licul, Esq.
               Rebecca J. Osborne, Esq.

          Attorneys for Defendants

          LITTLER MENDELSON, P.C.
          900 Third Avenue, 7th Floor
          New York, NY 10022
          By:  Andrew P. Marks, Esq.

**Sweet, D.J.**

Defendants Institute for Integration Nutrition ("IIN") and Joshua Rosenthal ("Rosenthal") (collectively, the "Defendants") in this putative class action have moved pursuant to the Federal Rules of Civil Procedure ("FRCP") 12(b)(6) to dismiss the Second Cause of Action (Retaliation under Title VII), the Third Cause of Action (Interference under the FMLA), the Fourth Cause of Action (Retaliation under the FMLA) and the Sixth Cause of Action (Retaliation under City Law) of plaintiffs Bailey Stoler ("Stoler"), Amy Hess ("Hess") and Jessica Marcus ("Marcus") (collectively, the "Plaintiffs"). Based on the conclusions set forth below, the motion is denied as to Stoler and Marcus, denied in part and granted in part as to Hess.

## Prior Proceedings and Facts

This action was commenced on February 25, 2013 by the Plaintiffs by the filing of a putative class action complaint charging Rosenthal and IIN with interference with their Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), rights, retaliation under the FMLA, and discrimination and

1

retaliation under the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL"). On June 3, 2013, the plaintiffs filed an Amended Complaint ("AC") adding claims of discrimination and retaliation under 42 U.S.C. § 2000e et seq. ("Title VII").

The AC alleges that IIN and Rosenthal violated Title VII, the FMLA, and the NYCHRL based upon the conduct as alleged below. In addition to the causes of action which are the subject of the instant motion, the Plaintiffs have alleged a First Cause of Action (Discrimination under Title VII) and a Fifth Cause of Action (Discrimination under City Law). The following facts are drawn from the AC.

IIN is a health coaching and nutritional education school.  Rosenthal is IIN's founder and director. Most of Defendants' employees are women. Plaintiffs are three women who were employed at IIN and became pregnant during their tenure at the company.

Plaintiffs allege that Defendants consider female employees' potential to have children when making employment decisions. AC ¶ 17. To make this determination, the Defendants

2

created an evaluation form that, among other things, asked managers to determine each employee's "future plans," including any "maternity" plans. AC ¶ 17. Around the time IIN was collecting this information, Rosenthal also requested the creation of a "Maternity Projection" chart (the "Maternity Projection Chart"). AC ¶¶ 20-28. The Chart used each female employee's age, marital status, and maternal status to determine how soon the employee was likely to have a child. Id. One iteration of the Chart stated that the individually named Plaintiffs were "likely" or "fairly likely" to have children within the next few years. Id. No male employees are included in the Chart. Id.

Defendants frequently demoted or fired female employees when they became engaged, married or pregnant, or took FMLA leave. Id. ¶¶ 18-19. They were regularly replaced with single and usually childless employees - employees who had been trained by the professionals they replaced. Id. ¶¶ 18, 28, 50, 75, 92, 104. Those junior employees frequently appear on defendants' maternity chart as less likely to have children. Id. ¶ 28, 50, 92.

3

Stoler has an educational background and career history including an advanced degree, a fellowship, and managerial positions. AC ¶¶ 9, 29. Stoler began working for IIN in February 2010, acting as an internal consultant, working directly with IIN's then-Chief Executive Officer ("CEO"). Id. ¶ 30. Defendants promoted Stoler to Marketing Director in April 2010. Id. ¶ 31. In June 2011, Defendants promoted Stoler again, making her part of IIN's Executive Team. Id. ¶ 32. Three months later, Defendants placed Stoler in charge of two departments. Stoler managed 32 employees. Id. ¶ 33.

In November 2011, Stoler told Rosenthal that she was pregnant and intended to take maternity leave. Id. ¶ 34. Rosenthal responded that, in his experience, "[w]omen's priorities shift when they become mothers" and that she should consider this while planning her maternity leave and her return to work. Id. Two weeks later, Rosenthal told Stoler her position might not be the same when she returned from maternity leave, but she was an excellent performer and should not be concerned that she would be let go. Id. ¶ 35.

Stoler submitted her FMLA paperwork in February 2012, and began her leave on May 7, 2012. Id. ¶¶ 36, 37. Initially,

4

Stoler's leave was scheduled to last until September 10, 2012; however, Stoler asked Rosenthal for a two-week extension of her leave. Id. ¶ 39. Rosenthal granted this extension, and Stoler's new return date was set for September 24, 2012. Id.

On or about August 2, 2012, Stoler asked Rosenthal what her position would be after her leave. Rosenthal told Stoler he was not sure. AC ¶ 38. The day before Stoler was scheduled to return, Rosenthal told her there were too many managers, that he needed to figure out a role for her, and not to report to work the next day. Id. ¶ 41. Stoler was then demoted two levels below her previous position, no longer reporting to Rosenthal or the CEO, and no longer managing employees. Id. ¶ 42. Rosenthal told Stoler she could "prove" herself in her new position; Stoler had never been told that she needed to "prove" herself in order to take on senior responsibilities before then. Id. ¶ 43.

Upon Stoler's return to work, she was moved into a cubicle with other Project Managers and out of her private office in the executive wing. Id. ¶ 44. Stoler complained to Kate Cody ("Cody"), an IIN Human Resources Manager ("HR"), and Michael Posavetz ("Posavetz"), IIN's Chief Operating Officer

5

("COO") and in-house counsel, about her demotion. Id. ¶¶ 46-48.
Rosenthal was informed of those complaints, and his response was
to tell Stoler that she was "making this up"; that she had been
in "a very soft world with [her] baby for the past few months,
so the work world [felt] very harsh and aggressive to [her]";
and that she was in "culture [shock] from being at home with
[the] baby." Id. ¶¶ 45, 47.  Shortly thereafter, Defendants told
Stoler she was no longer eligible for bonuses amounting to
almost half of her compensation. Id. ¶¶ 52-53.

On December 18, 2012, Rosenthal told Stoler that "ever
since [she] gave birth, [he had] wanted to give [Stoler] space
and keep [her] away from everything and the fast work in the
Company." AC ¶ 54. Although he said he wanted her to "become
more involved in the Company," in January 2013 Defendants posted
a job listing describing Stoler's role and responsibilities
before her leave. Id. ¶¶ 54-55.

On February 25, 2013, Plaintiffs filed the initial
Complaint on this matter. On May 1, 2013, Stoler asked Cody if a
recently hired HR consultant was aware of the issues in
Plaintiffs' lawsuit. Cody said she was. Id. ¶ 61. Around that
time, Stoler complained to IIN's President Michael Iacona

("Iacona") about her demotion after her leave and said she believed it was because of IIN's discrimination and retaliation against her. Id. ¶ 62. Iacona responded by claiming that Stoler was suffering from "anxiety over things moving at a fast pace." Id. He chastised Stoler for continuing to "re-hash" her "prior grievances." Id. He warned Stoler that continuing to engage in a "debate" about those matters was a "distraction" that would "have negative impacts on our business should this continue." Id.

On May 14, 2013, Defendants fired Stoler, claiming her position had been eliminated. Id. ¶ 63. Defendants told Stoler she was eligible for career transition services and that she would receive a severance agreement in the mail. Id. She was directed to return all company property and told to gather her personal belongings. Id.

After firing Stoler, Defendants purported to offer her a junior-level position, earning approximately 30% of her pre-maternity leave compensation. Id. ¶ 64. The "new" position required only a college degree and two years of general experience; Stoler had an MBA, more than 10 years of industry-specific experience and had previously been on IIN's Executive

7

Team. Id. Despite the purported job offer, Defendants immediately removed Stoler's computer access, took her security keycard and escorted her out of the building. Id. ¶ 65. On May 16, 2013, Stoler wrote Cody an email stating that the purported job offer was not made in good faith and asked to be reinstated to her pre-maternity leave position. Defendants refused. Id. ¶ 66.

Hess has more than 10 years of experience in marketing and public relations. AC ¶¶ 10, 67. She began working at IIN on or about November 16, 2011 as the Marketing Manager, reporting to the CEO. Id. ¶ 68. Hess was responsible for IIN marketing campaigns and managed 15 to 18 employees. Id.

On October 9, 2012, Hess informed Rosenthal, HR, and IIN's CEO that she was pregnant and would need to take FMLA leave. Id. ¶ 69. On or about October 24, 2012, Rosenthal met with Hess with a co-worker present. Rosenthal told Hess that he had "never met a new mom that didn't underestimate the sleep, time, exhaustion from a new baby." Id. ¶ 70. Rosenthal advised Hess to speak with her partner to see "if it was worth it." Id. He told Hess that she was at a certain level of performance, but with IIN's CEO leaving and Hess having a baby, Rosenthal needed

8

to "protect" himself and IIN because her performance could decline. Id.

The following week, Hess wrote Rosenthal that she wished to remain with IIN. Id. ¶ 71. Hess wrote that her work performance and capacity were not diminished by her pregnancy and would not be after she had her child. Id. Hess said she expected to return to her position after her leave and to continue to report to Rosenthal and the new CEO. Id.

Thereafter, Defendants allegedly looked for a reason to fire Hess. Id. ¶ 72. Rosenthal began falsely criticizing Hess' performance. Id. ¶ 73. In mid to late November 2012, he told Hess' staff that she was not in charge of Marketing, stating that Hess was "spread too thin" and could not manage her former duties. Id. ¶ 74. Defendants removed a portion of Hess' managerial duties, repeating the false concern for Hess' workload and adding that people who were "spread too thin" would have their compensation decreased. Id. ¶¶ 75-76. Rosenthal assigned Hess' managerial duties to two junior employees who were not pregnant and did not have children. Id. ¶ 75.

9

Hess asked Rosenthal for more information about her new role; he did not respond. AC ¶ 77. After Hess sent another email, Rosenthal, Posavetz, and another employee met with Hess. Id. ¶ 77-78. Rosenthal said Hess was not being demoted or fired, but would no longer supervise one of her teams. Id. ¶ 78. The following day, December 14, 2012, Hess met with Posavetz and HR. Id. ¶ 79. Posavetz stated Hess would not receive a raise and her bonus would be cut for 2013. Id. Hess' 2012 bonus was approximately $25,000, a significant portion of her total compensation. Id. Posavetz then told Hess that she would receive "a small increase" or a "put-your-mind-at-ease amount" of $5,000. Id. Posavetz stated Rosenthal was not sure what Hess' role with IIN would be in the future or what value she had provided, or would provide, but said those issues would be determined in January 2013. Id. Around that time, Rosenthal met with several employees and also told them that Hess' "role change" would not be settled until January 2013. He told at least one of Hess' colleagues not to work with her. Id. ¶¶ 80-81.

In or about December 2012, Defendants posted a job listing for a new Marketing Director, which described Hess' role and responsibilities. Id. ¶ 82. Defendants dismissed Hess on

10

February 8, 2013, 10 days before the start of her maternity
leave. Id. ¶ 84. Defendants ultimately hired a man to replace
Hess and placed him in Hess' former office. Id. ¶ 87.

Marcus is an experienced Registered Dietitian and
Certified Dietitian-Nutritionist. AC ¶¶ 11, 88. IIN hired Marcus
in April 2011 as a Curriculum Developer with a salary of
$45,000. Id. ¶ 89. In the summer of 2011, Defendants gave Marcus
more responsibilities, and she began to hire and manage staff
for the nutrition team. Id. ¶ 90.

In September 2011, Marcus announced she was engaged to
be married. Id. ¶ 91. In December 2011, Stoler strongly
recommended that Rosenthal promote Marcus. Id. ¶ 92. Rosenthal
declined, saying that Marcus was "getting married, and her head
was in another place." Id. Rosenthal promoted a more junior
employee who was listed on Defendants' Maternity Projection
Chart as "not likely" to have a child within five years. Id.

On or about March 29, 2012, Rosenthal told Marcus that
if she made certain cuts to her department by November 2012, she
would receive a raise to $100,000 per year. Id. ¶ 93. Over the

11

course of the next month, Marcus complied with Rosenthal's request. Id. ¶ 94.

In June 2012, while Stoler was on leave, Rosenthal asked Marcus to be the Manager of Student Services. Id. ¶ 95. In that role, Marcus managed 20 staff members and reported directly to Rosenthal. Id. Rosenthal praised Marcus' performance. Id. Marcus asked whether Stoler would resume her position as Manager/Director of Student Services when Stoler returned from leave; Rosenthal replied that Marcus would continue in that role. Id.

At a June 27, 2012 off-site meeting, Rosenthal praised Marcus as one of IIN's strong leaders. Id. ¶ 96. By August 2012, Marcus was one of the top two managers in IIN's Education Department and the sole Student Services Department Manager. Id. ¶ 97.

On August 13, 2012, Marcus told Rosenthal she was pregnant, she was committed to her work, and that her commitment would not change. AC ¶ 98. The next day, Rosenthal met with Marcus to discuss her pregnancy. Id. ¶ 99. Rosenthal told Marcus there were conversations about whether to retain her. Id. He

12

said he was not sure they were on the "same page" and said that "maybe it will work; maybe it will not." Id. On August 15, 2012, Marcus met with Posavetz. Id. ¶ 100. Marcus told Posavetz that she was nervous she would lose her job because she was pregnant. Id. Marcus also told him IIN had a history of laying off pregnant women. Id.

On September 5, 2012, Rosenthal and HR met with Marcus to discuss a purported issue with Marcus' listening skills. AC ¶ 102. Two weeks later, Rosenthal told Marcus she would now work only on two special projects and in a peripheral position, supporting a new Manager/Director. Id. ¶ 103. Rosenthal told Marcus she was no longer on the Management Team. Id. IIN removed Marcus from her Nutrition Manager position on September 21, 2012, replacing her with an unmarried woman with no children, whom Marcus had hired and trained. Id. ¶ 104.

On or about December 6, 2012, Marcus met with Posavetz and HR. Id. ¶ 105. Posavetz told Marcus that Rosenthal no longer wanted her to work on one of her projects, thereby removing one-third of her responsibilities. Id. He added that she would have a new role. Marcus received a salary increase to $75,000 - $25,000 less than Rosenthal had promised. Id. In her new

13

position, Marcus reported to a junior employee and managed no one. Id. ¶ 106.

In early March 2013, Marcus began her FMLA leave. She gave birth on March 13, 2013. AC ¶ 108. On May 14, 2013, Marcus sent an email to Cody to acknowledge IIN's constructive discharge of her. Marcus observed that as soon as she announced her pregnancy, Rosenthal demoted her and withheld a significant pay increase. She stated that IIN's actions made it clear that IIN did not want her to continue as an employee after she had a child and that IIN would only continue its efforts to force her out of the company. Id.

On February 25, 2013, Plaintiffs filed the initial Complaint in this matter. On April 5, 2013, Plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") alleging gender and pregnancy discrimination and retaliation in violation of Title VII. On April 30, 2013, Defendants' managers held meetings with the staff. Id. ¶ 60. Among other things, Iacona acknowledged this instant lawsuit but denied the allegations. Id. He announced that employees who did not have it in their hearts to work for IIN should step forward

14

and IIN would structure a mutually beneficial exit agreement.
Id.

The instant motion to dismiss certain of the
Plaintiffs' causes of action was heard and marked fully
submitted on September 18, 2013.

**The Applicable Standard**

On a motion to dismiss pursuant to FRCP 12(b)(6), all
factual allegations in the Complaint are accepted as true, Krijn
v. Pogue Simon Real Estate Co., 896 F.2d 687, 688 (2d Cir.
1990), and all inferences are drawn in favor of the pleader.
Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d
Cir. 2011). The issue "is not whether a plaintiff will
ultimately prevail but whether the claimant is entitled to offer
evidence to support the claims." G-I Holdings, Inc. v. Baron &
Budd, 238 F. Supp. 2d 521, 534 (S.D.N.Y. 2002) (quoting Villager
Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)).

A complaint must "contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

15

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678-79. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Id. (citations and quotations omitted). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

Moreover, to survive a motion to dismiss, a complaint need not contain specific facts establishing a prima facie case of discrimination. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002); see Twombly, 550 U.S. at 547; Robinson v. Gucci Am., 11-CV-3742, 2012 WL 259409, at *3 (S.D.N.Y. Jan. 27, 2012)

16

(complaint need not plead a prima facie case of employment discrimination).

The elements of proof needed in pattern or practice claims are different than those in individual discrimination cases. As the Second Circuit held in U.S. v. City of N.Y., 717 F.3d 72, 84 (2d Cir. 2013):

> In a pattern-or-practice case, the plaintiff's initial burden is heavier in one respect and lighter in another respect than the burden in an individual case. It is heavier in that the plaintiff must make a prima facie showing of a pervasive policy of intentional discrimination, rather than a single instance of discriminatory treatment. It is lighter in that the plaintiff need not initially show discrimination against any particular present or prospective employee. Although instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required; a statistical showing of disparate impact might suffice.

(internal citations omitted), see also Emps. Committed For Justice v. Eastman Kodak Co., 407 F. Supp. 2d 423, 430 (W.D.N.Y. 2005) ("It is the landscape of the total work environment, rather than the subjective experiences of each individual claimant that is the focus for establishing a company policy or practice of . . . systemic discrimination in the workplace.") (quoting EEOC v. Mitsubishi Motor Manufacturing of America, 990

17

F. Supp. 1059, 1074 (C.D. Ill. 1998)) (internal quotations omitted).


In class actions such as this, individual and class issues are not readily separated. Evidence of company-wide policies of discrimination strengthen individual discrimination claims and vice versa. See Peterson v. Seagate U.S. LLC, Civ. 07-2502, 2010 WL 5924322, at *4 (D. Minn. Dec. 28, 2010), rpt. and recom'n adopted, 2011 WL 578761 (Feb. 8, 2011) ("[I]ndividual plaintiff's circumstances are relevant to class-based claims and conversely, statistical and class oriented evidence may be relevant to individual claims.") (citations omitted).


In the class context, pleadings concerning an employer's practice of unlawful treatment of employees may be sufficient to plead individual claims. See Gordon v. Kaleida Health, 08-CV-378S, 2008 WL 5114217, at *3 (W.D.N.Y. Nov. 25, 2008), order amended on reconsideration on other grounds, 2009 WL 4042929 (Nov. 19, 2009) (denying motion to dismiss in wage and hour case where "Plaintiffs plead the factual grounds supporting their claims by identifying three specific policies/practices of Defendants").

18

**The Motion To Dismiss The Third Cause Of Action Is Denied**

The Third Cause of Action has sufficiently alleged FMLA interference claims for Plaintiffs. Defendants cannot escape FMLA liability by coercing or attempting to coerce employees to forego their FMLA rights. The AC has alleged a history of the Defendants' interfering with employees' FMLA rights. AC ¶¶ 18(a), (b), (c); 20; 34-66; 69-85.

Under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any" FMLA right. 29 U.S.C. § 2615(a)(1). An employee who takes leave must therefore be restored to an equivalent position upon her return post leave. 29 U.S.C. § 2614(a)(1); Roberts v. Ground Handling, Inc., 499 F. Supp. 2d 340, 350-51, 355-56 (S.D.N.Y. 2007). An employer who does not restore an employee to her former position interferes with her FMLA rights. See, e.g., Brenlla v. LaSorsa Buick Pontiac Chevrolet, Inc., 00 Civ. 5207, 2002 WL 1059117, at *5-6 (S.D.N.Y. May 28, 2002). FMLA regulations further state that "[i]nterfering with the exercise of an employee's rights would include . . . not only refusing to

19

authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

To state a claim for interference with FMLA rights, a plaintiff must prove that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) she was denied benefits to which she was otherwise entitled under the FMLA. Roberts v. AIG Global Inv. Corp., 06 Civ. 5966, 2008 WL 4444004 (S.D.N.Y. Sept. 30, 2008). There is no dispute as to the second element of Plaintiffs' interference claim. Defendants do not dispute the first three elements with regards to Stoler's interference claim. Defendants do not dispute the fourth element with regards to Hess' claim. Defendants do not dispute the first four elements with regards to Marcus.

Defendants pre-FMLA leave comments and actions during Stoler's leave constitutes interference of Stoler's FMLA rights. Rosenthal told Stoler pre-FMLA leave that she should consider her priorities in planning her leave and return to work. Two weeks after Stoler told Rosenthal that she would take leave Rosenthal told her that her position might change when she

returned. Rosenthal further told Stoler, before her FMLA leave
ended and before Stoler had asked for an extension of that
leave, that her position might change when she returned. Taken
in totality, it is plausible that such comments were designed to
coerce Stoler to leave her employment or to discourage Stoler
from using her leave. Plaintiffs allegations adequately allege
that Defendants began the process of demoting Stoler well before
her FMLA leave ran out.

Rosenthal also told Stoler that there were too many
managers, that he needed to figure out a role for her, and not
to report to work the day she was supposed to return from her
leave. When Stoler returned, she was demoted two levels below
her previous position and moved out of her private office into a
cubicle. Given such occurrences, Plaintiffs have adequately pled
that Stoler was not restored to her original position upon her
return from FMLA leave.

Defendants argue that Stoler merely requested for
maternity leave, which is not synonymous with FMLA leave.
However, a plaintiff's use of the term "maternity" rather than
"FMLA" leave does not vitiate her claim or rights under the
FMLA. A plaintiff need not use the term "FMLA" to receive FMLA

21

protection. 29 C.F.R. § 825.302(c); see <u>Mullin v. Rochester</u> <u>Manpower, Inc.</u>, 192 F. Supp. 2d 80, 84 (W.D.N.Y. 2002) (employee covered by FMLA when she requested maternity leave although she did not specifically mention the FMLA). "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c). Stoler was under no obligation to specifically mention the FMLA when requesting leave. Moreover, it is plausible that Rosenthal understood that Stoler asked for FMLA leave when she said she would need to take maternity leave. Even if Rosenthal did not understand Stoler to be requesting FMLA leave, Stoler applied for FMLA leave in February 2012. AC ¶ 36.

Defendants assert that Stoler's FMLA rights were vitiated because she extended her leave an additional two weeks on top of her 12 weeks of leave provided under the FMLA. However, Stoler asked for an extension of leave from IIN, and Rosenthal approved it without telling Stoler her FMLA rights would be affected. Stoler also agreed to attend weekly IIN meetings before the end of her FMLA leave. FMLA coverage applies to a plaintiff who has taken, with her employer's permission, a leave greater than 12 weeks, <u>Santosuosso v. NovaCare Rehab.</u>, 462

22

F. Supp. 2d 590, 597-98 (D.N.J. 2006), and Stoler did not
vitiate her FMLA rights simply by taking an approved extension
of leave.

The two cases cited by Defendants are distinguishable.
In both of these cases, plaintiffs were unable to return before
the end of their leave and were not given permission to extend
their leave. See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,
183 F.3d 155, 157, 161-62 (2d Cir. 1999) (making no indication
that plaintiff requested for additional leave and that at the
end of the 12-week FMLA-leave period, plaintiff was unable to
perform the essential functions of his position); Vangas v.
Montefiore Med. Ctr., 11 Civ. 6722, 2013 WL 656892, at *3
(S.D.N.Y. Feb. 22, 2013) (plaintiff pled "no facts to indicate
that she could have returned to work at the end of her FMLA
leave either because she was well enough to return or because
she could have scheduled her FMLA leave better if she had had
more notice" and that plaintiff's "own pleadings show she could
not return to work"). Geromanos v. Columbia Univ., 322 F. Supp.
2d 420, 428-29 (S.D.N.Y. 2004), is distinguishable because the
plaintiff had failed to comply with rules associated with
plaintiff's substance abuse treatment, which was the medical

reason for her leave. A consensual extension of an FMLA leave does not bar a plaintiff from asserting FMLA rights.

Defendants contend that Hess was not a covered employee because she had not worked for Defendants for 12 months when she requested FMLA leave. However, FMLA eligibility determinations "must be made as of the date the FMLA leave is to start." 29 C.F.R. § 825.110(d); see Pereda v. Brookdale Senior Living Cmtys., Inc., 666 F.3d 1269, 1273 (11th Cir. 2012) (employee who would have begun leave when she was eligible was protected by FMLA); Corral v. Hersha Hospitality Mgmt., Inc., 12-cv-02375, 2012 WL 4442666, at *7-10 (D.N.J. Sept. 24, 2012) (FMLA eligibility is determined at the start of leave). Hess was thus protected by the FMLA because she was eligible for FMLA leave when her leave was scheduled to start.

Hess could not exercise her rights under the FMLA, however, because Defendants fired her. Preventing employees from exercising their FMLA rights violate the FMLA, 29 C.F.R. § 825.220(b). Defendants argue that there is no causal connection between Defendants' dismissal of Hess and her FMLA leave. However, Plaintiffs alleged that Defendants fired Hess 10 days before her FMLA leave. AC ¶ 84. This close temporal proximity

24

between Defendants' dismissal and Hess' FMLA leave is sufficient showing of interference at the motion to dismiss stage. See Crisses v. Gucci America, Inc., 10 Civ. 8393, 2012 WL 3834634 (S.D.N.Y. Aug. 21, 2012).

Plaintiffs allege that Marcus was "constructively discharged," that Defendants coerced Marcus to forego her FMLA rights. While constructive discharge and interference claims are generally brought as separate claims see, e.g., Smallcomb v. Geisinger System Services, 08 Civ. 175, 2010 WL 1253482 (M.D. Pa. March 24, 2010), constructive discharge can be pled to show that the employer denied the employee FMLA benefits to which she was entitled, see Lee v. City of Columbus, 07 Civ. 1230, 2009 WL 2525143, at *8 (S.D. Ohio Aug. 13, 2009). To establish a constructive discharge, Plaintiffs must establish that Defendants deliberately made Marcus' working conditions so intolerable that a reasonable person in her shoes would have felt compelled to resign. Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 89 (2d Cir. 2007).

Marcus told Posavetz about her concerns about the security of her job in light of her pregnancy and noted that IIN had a history of firing pregnant women. Posavetz, however,

25

ignored Marcus' concerns, and Defendants marginalized and demoted Marcus. Defendants' treatment of Marcus made it clear that "she was not wanted as an employee." Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 476-77 (S.D.N.Y. 2013) (constructive discharge where plaintiff was made to feel, "not wanted as an employee") (collecting cases). Thus, while Marcus did resign from employment during her FMLA leave, Plaintiffs have sufficiently pled constructive discharge and a claim that IIN interfered with Marcus' FMLA rights.

## The Motion To Dismiss The Fourth Cause Of Action Is Denied

The FMLA prohibits employers from retaliating against employees who exercise their FMLA rights or oppose an employer's unlawful practices under the FMLA. Smith v. Westchester Co., 769 F. Supp. 2d 448, 469-70 (S.D.N.Y. 2011). A plaintiff makes out a prima facie case of retaliation where she establishes that: "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for [her] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Drew v. Plaza Constr. Com., 688 F. Supp. 2d 270, 277 (S.D.N.Y. 2010) (quotation marks omitted). Plaintiffs

26

need prove only that their FMLA leave was a motivating factor in defendants' decisions, not that it was the sole reason. Mullins v. Bondib Hotels, Inc., 10 Civ. 4069, 2011 WL 6434328, at *4, 6 (S.D.N.Y, Dec. 22, 2011). Requests for FMLA leave are protected activity. Pereda, 666 F.3d at 1276. Plaintiffs have adequately alleged the exercise of their rights and adverse action by the Defendants.

It is alleged that, in the first four months after Stoler returned from maternity leave, Rosenthal demoted her, moved her into a cubicle, significantly cut her compensation, and posted a job listing for a high-level executive to replace Stoler. Stoler complained about these actions in a series of conversations with Rosenthal, Posavetz, and Cody. On February 25, 2013, the Plaintiffs filed their initial complaint in this action, and on April 5, 2013, Plaintiffs filed charges against the Defendants with the EEOC. Stoler was fired on May 14, 2013. The timing of those events alone is sufficient to make out a plausible FMLA retaliation claim. See Behringer v. Lavelle Sch. for the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *15 (S.D.N.Y. Dec. 17, 2010) ("Temporal proximity ... can give rise to an inference of retaliation .... ") (internal quotation omitted).

The AC has alleged that after Hess informed Rosenthal of her pregnancy in early October 2012 by email. When advised of Hess' pregnancy, Rosenthal told Hess that he had "never met a new mom that didn't underestimate the sleep, time, exhaustion from a new baby" and advised Hess to speak with her partner to see "if it was worth it." Rosenthal also told Hess that he needed to "protect" himself and IIN because her performance could decline. In response, Hess advised Rosenthal affirmatively that her performance would not be diminished upon her return to her position. Over the course of the next several months, Rosenthal began to falsely criticize her work, took away her responsibilities, cut her annual bonus by $20,000, told at least one of Hess' colleagues to stop working with her, posted a new job listing that described Hess' jobs role and responsibilities, and fired her 10 days before the start of her leave. The Court finds that Plaintiffs have sufficiently pled an FMLA retaliation claim.

In a little more than a month after Marcus announced her pregnancy, and the need to take FMLA leave, and complained to HR that she was concerned about IIN's history of dismissing pregnant women, Rosenthal removed Marcus from IIN's management

28

team and her position as the Nutrition Manager, replacing her
with a junior employee without children whom Marcus had trained.
By year end, Rosenthal reduced Marcus' promised raise by
$25,000. In March 2013, Marcus began her FMLA leave, and on May
14, 2013, Marcus asserted to IIN that she had been
constructively discharged. These allegations adequately allege
retaliation against Marcus.


**The Motion To Dismiss The Second Cause Of Action
(Retaliation Under Title VII) And The Sixth Cause
Of Action (Retaliation Under City Law) Is Denied
As To Stoler And Marcus And Granted As to Hess**


As concluded above, contrary to Defendants'
assertions, Defendants had notice of the protected activities of
Stoler and Marcus, and the allegations of Stoler and Marcus in
the AC plead sufficient facts to establish a causal connection
between those activities and Defendants' adverse employment
actions. Defendants have not addressed the class retaliation
claims, also encompassed in the second and sixth causes of
action.


In a retaliation claim under Title VII, the plaintiff
must first establish a prima facie case of retaliation by
showing: "(1) his participation in protected activity; (2)

29

defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011); see also Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2532-33 (2013); Barkley v. Penn Yan Cent. Sch. Dist., 442 F. App'x 581, 583 (2d Cir. 2011); Valtchev v. City of N.Y., 400 F. App'x 586, 589 (2d Cir. 2010); Pilgrim v. McGraw-Hill Co. Inc., 599 F. Supp. 2d 462, 468 (S.D.N.Y. 2009).


In Nassar, the Supreme Court held that the "but-for" causation standard applied to Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), claims in Gross v. FBL Fin. Servs., 557 U.S. 167 (2009), should be applied to Title VII retaliation claims. Nassar, 133 S. Ct. at 2520-21. But even under the "but-for" standard articulated in Gross and adopted in Nassar Plaintiffs need not show that retaliation is the only cause of an adverse action. Fuentes v. Jamaica Colosseum Mall, 09 CV 03276, 2012 WL 2872122, at *3 (E.D.N.Y. June 5, 2012); rpt. and recom'n adopted, 2012 WL 2872119 (July 12, 2012). "Instead, an employer may be held liable under [a but-for standard] if other factors contributed to its taking an adverse action, as long as [the protected characteristic] was the factor

that made a difference." Jones v. Oklahoma City Pub. Sch., 617
F.3d 1273, 1277-78 (10th Cir. 2010) (citations and quotation
marks omitted) (ADEA case); see also Gorzynski v. JetBlue
Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) ("[P]laintiff
[has] the burden of demonstrating that his or her [protected
characteristic] was a motivating factor in the adverse
employment action.").

As noted above, at the stage of a motion to dismiss,
the "relevant question" is whether plaintiffs have pled,
"factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." Kassman, 925 F. Supp. 2d at 461 (internal citation
omitted). Defendants have contended that the individual
plaintiffs failed to engage in protected activity.

An employee's opposition to violations of Title VII or
a complaint to her employer about them is protected activity.
See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.
Tenn., 555 U.S. 271, 276 (2009) (employee communications to
employer that employer engaged in discrimination is protected
activity) (internal citations omitted); La Grande v. DeCrescente
Distrib. Co., Inc., 370 F. App'x 206, 212 (2d Cir. 2010).

31

(opposition to discrimination includes complaints to management). "Opposition" and "participation" are interpreted broadly because "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989); Crawford, 555 U.S. at 278-79 ("opposition" interpreted broadly to achieve Title VII's primary objective of avoiding harm to employees).

As set forth above, Stoler and Marcus complained about and opposed the discrimination to which they and other women were subject. Stoler repeatedly expressed concern to Rosenthal, AC ¶ 143-47, HR, id. ¶¶ 46, 48, and IIN's in-house counsel, id. ¶ 48, about the demotions she experienced immediately after her return from maternity leave. Stoler also complained specifically about the discrimination to which she was subject, including a complaint to Rosenthal that he seemed to believe she was less capable because of her pregnancy. Id. ¶ 51. Stoler also complained in the first week of May 2013 about the continuing discrimination and retaliation. Id. ¶¶ 61-62. Marcus went directly to IIN's in-house counsel and told him she was concerned about her job because of her pregnancy and that Defendants had a history of firing pregnant women. Id. ¶ 100.

32

Stoler was fired from her position, while Marcus was constructively discharge, see supra.

Although Hess stated to Rosenthal that her commitment and capabilities were not affected by her pregnancy, AC ¶ 71, and thereafter complained to Rosenthal and others about IIN's demotion of her, id. ¶ 77, she did not make a complaint about the alleged policy discriminating against pregnant women prior to her filing of the AC.

It is plausible that Defendants understood the actions of Stoler and Marcus to have been protected activity. See Albunio v. City of New York, 16 N.Y.3d 472, 479 (N.Y. 2011) (under NYCHRL, jury could conclude that employer was aware of plaintiff's protected activity where plaintiff stated that employer's treatment of gay coworker "was wrong" even though she "did not say in so many words that [the coworker] was a discrimination victim"). Defendants' contention that Stoler and Marcus have failed to allege known protected activity is contradicted by the allegations described above. See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (protected activities include "informal protests of discriminatory employment practices . . . . ").

33

The temporal proximity between the protected activities of Stoler and Marcus and the adverse actions establishes the causal connection. See Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (close temporal proximity is, by itself, sufficient to find causation); see also Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 214 (2d Cir. 2010) (causation established where adverse actions occurred five months after protected activity). Stoler faced increasing adverse employment actions each time she resisted Defendants' discriminatory actions. AC ¶¶ 43-48, 51, 59, 61-62. That retaliation culminated in her dismissal two weeks after her last complaints to management of discrimination and retaliation. Id. ¶ 63. Marcus was similarly subject to retaliation after she complained she was worried about her position because defendants had a history of dismissing pregnant women. Id. ¶ 100. Within weeks of this complaint, Rosenthal and HR reprimanded Marcus, demoted Marcus, and replaced her with a more junior employee. Id. ¶¶ 101-04.

The cases cited by Defendants in opposition are inapposite as they were decided at the summary judgment stage, not upon a motion to dismiss. See Slattery v. Swiss Reinsurance

34

America Corp., 248 F.3d 87 (2d Cir. 2001); Ramsey v. City of
N.Y., 06 Civ. 173, 2009 WL 637157 (S.D.N.Y. March 10, 2009);
Castro v. New York City Bd. of Educ. Personnel, 96 Civ. 6314,
1998 WL 108004 (S.D.N.Y. March 12, 1998). At this stage, the
Plaintiffs are merely required to plead facts that could
plausibly assert the claims they allege. Stoler and Marcus
protested Rosenthal's discriminatory attitude toward their
pregnancy, telling him and other IIN managers that they were
capable of performing their duties before and after IIN took any
adverse employment actions against them. Moreover, unlike the
plaintiffs in the cases cited by Defendants, the Plaintiffs in
this case did not have long disciplinary histories. See
Slattery, 248 F.3d at 95 (progressive discipline began five
months before plaintiff complained of discrimination); Ramsey,
2009 WL 637157, at *9 ("Plaintiff was subject to repeated
warnings and suspensions throughout 2003; his protected conduct
began in February 2004."); Castro, 1998 WL 108004, at *2-4
(defendant gave plaintiff unsatisfactory review a year before
plaintiffs protected activity began).

Stoler and Marcus have sufficiently alleged facts
establishing a prima facie case of retaliation under Title VII
that: (1) they participated in protected activity; (2) known to

defendants; (3) they suffered an adverse employment action; and (4) the retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. Stoler and Marcus have alleged sufficient facts to survive a motion to dismiss under Title VII. Further, since protection under the NYCHRL is considerably broader than under Title VII, see Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 171-75 (S.D.N.Y. 2011) (noting that the NYCHRL has "uniquely broad and remedial purposes, which go beyond those of counterpoint State or federal civil rights laws"); Weiss v. JPMorgan Chase & Co., 06 Civ. 4402, 2010 WL 114248 (S.D.N.Y. Jan. 13, 2010) (pointing out that NYCHRL claims are reviewed "more liberally" than federal counterparts), Stoler and Marcus have sufficiently alleged an NYCHRL claim.

**Conclusion**

Pursuant to the Court's reasoning above, the Defendants' motion to dismiss the Second and Sixth Causes of Action is denied as to plaintiffs Stoler and Marcus and granted as to plaintiff Hess. The Defendants' motion to dismiss the Third and Fourth Causes of Action is denied for all Plaintiffs.

36

It is so ordered.

New York, NY
November   15, 2013

ROBERT W. SWEET